**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

---

PLAINTIFFS, THOMAS WOODS AND
JOSHUA HINDERER, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,                                       JURY TRIAL DEMANDED

                    *Plaintiffs*,

    v.

NATURE'S VARIETY, INC.,                                   Case No.

                  *Defendant.*

---

## CLASS ACTION COMPLAINT

Plaintiffs, Thomas Woods and Joshua Hinderer, ("hereinafter Plaintiffs"), individually, and on behalf of all other similarly situated persons, by and through their undersigned counsel, bring this Class Action Complaint against Defendant, Nature's Variety, Inc. (hereinafter "Defendant").

## SUMMARY OF THE CASE

1.    Nature's Variety is a company that deceptively markets and labels two pet food product lines named Nature's Variety Instinct, and Nature's Variety Prairie (hereinafter "Nature's Variety Products") as "all natural," "naturally preserved," and "100% free of chemical preservatives" pet foods.  In reality, Nature's Variety's pet foods are not "natural," are not "naturally preserved," nor are they "100% free of chemical preservatives."  As described more fully herein, Nature's Variety pet foods contain synthetic, artificial, and chemically processed ingredients, chemical preservatives, genetically modified ingredients, and hexane processed ingredients.

2.	Manufacturing, producing, marketing, selling, and distributing pet food and treats is a $16,000,000,000 a year industry in the United States alone. The majority of the 163,000,000 pets in the United States are fed commercial pet food and derive all of whatever nutritional content they can obtain from commercial pet foods.

3.	Defendant's marketing and labeling practices with respect to its Nature's Variety Natural Products claim to offer "natural" pet food products, which are made from natural ingredients, and thus claim to be void of synthetic, artificial, and chemically processed ingredients and/or preservatives.  Defendant also specifies that its pet foods at 100% free of chemical preservatives.

Specifically, Defendant makes the following false and deceptive claims on its Nature's Variety Instinct, and Nature's Variety Prairie labels:

- **Natural** Nutrition
- All **Natural** Nutrition
- This is a **naturally** preserved product.
- We believe the best nutrition comes from healthy, **natural** ingredients.

Additionally, Defendant makes the following false and deceptive claims on its website in regards to both Nature's Variety Instinct, and Nature's Variety Prairie:

- "Nature's Variety makes a variety of premium, wholesome, **natural** foods to keep pets healthy and happy." [1]
- "Our foods are 100% free of corn, wheat, soy, **chemical preservatives**, and artificial colors & flavors." [2]
- "Our formulas combine meat, poultry, and fish protein with other simple, **natural**, high quality ingredients to provide a variety of forms, flavors, and textures." [3]
- "Instinct foods provide **natural** and healthy nutrition for your dog or cat." [4]
- "Pride by Instinct is made with carefully selected **natural** ingredients."
- "Our Limited Ingredient Diets are made with only pure, simple, essential ingredients that have been carefully chosen for their nutritional value and high

[1] http://www.instinctpetfood.com/aboutus (last visited on 5/20/15).
[2] http://www.naturesvariety.com/products (last visited on 5/20/15).
[3] http://www.instinctpetfood.com/nutritionphilosophy (last visited on 5/20/15).
[4] http://www.instinctpetfood.com/productchoices (last visited on 5/20/15).

digestibility. Each diet provides grain free, gluten free nutrition with one protein and one simple starch, combined with just a few other wholesome, **natural** ingredients." [5]

*See* Exhibit 1

4.      Nature's Variety's marketing strategy capitalizes on the extraordinary consumer demand for natural products. In 2008, food labeled as "natural" generated a striking $22.3 billion in sales, a 10% increase from 2007, and a 37% increase from 2004.[6]  In 2013, food labeled as "natural" generated $26.6 billion in sales, an increase of nearly 20% since 2008.[7]  A 2010 survey conducted by Mintel Group, LTD. Found that 65% of respondents were "somewhat interested" or "very interested" in natural products and that 62% of respondents who used natural products agreed that it was worth paying more for certain types of products labeled "natural." Simply put, Nature's Variety's "natural" claims on its pet food products is designed to boost demand for the product.

5.      The decision to make a particular claim to market a product is not one that consumer goods manufacturers make lightly. By making statements describing its pet foods, such as "natural," "natural nutrition," "natural ingredients," or "100% free of chemical preservatives," Nature's Variety demonstrates its belief these claims regarding its pet food products is important to consumers in general, and the "natural" and "100% free of chemical preservatives" claim Nature's Variety makes about its pet food products specifically motivates consumers to purchase said products. Our clients have purchased Nature's Variety Products based on these "natural" and "100% free of chemical preservatives" claims.

_____

[5] *Id.*
[6] http://www.nielsen.com/us/en/insights/news/2009/natural-beats-organic-in-food-sales-according-to-nielsens-healthy-eating-report.html
[7] http://newhope360.com/news-analysis/nfm-market-overview-2014-what-do-you-need-do-next

6.     Research studies illustrate that a company's marketing of products as "natural" increases the consumers' willingness to pay (WTP) by up to twenty-five percent (25%) at the 95th percentile of consumers, and seventeen percent (17%) on average for all consumers. According to a June 2014 consumer report survey, many consumers feel that a "natural" label on packaged/processed foods currently means no pesticides were used (66%), no artificial ingredients were used (66%), no artificial materials were used during processing (65%), and no GMOs were used (64%). A 2010 study by the Hartman group found that 62% of consumers surveyed associated "natural" with the "absence of pesticides" or synthetic substances. *See* Consumer Reports National Research Center, Food Labels Survey (2014) at 17. That study also found that 59% of consumers surveyed associated "natural" with the "absence of herbicides." *Id.* A follow-up study conducted by the Hartman Group in 2012 similarly concluded that 50% of core consumers perceive "natural" to mean free of pesticides and herbicides. *See* Hartman Group, Organic & Natural 2012, at 33 (emphasis added).

7.     Defendant's Nature's Variety Products are sold with a label that, in describing the contents, displays the word "natural." Defendant also states that its pet foods use only natural ingredients that have no chemical preservatives.[8]  In truth, the Nature's Variety Products contain synthetic, artificial, and chemically processed preservatives such as ethoxyquin, tocopherols, citric acid.  Defendant also includes synthetic, artificial and chemically processed ingredients including but not limited to, sodium phosphate, and calcium phosphate.  Furthermore, Defendant also uses genetically modified and hexane processed ingredients such as lecithin, sunflower oil and canola oil. *See* 21 C.F. R. 573.3280; 21 C.F.R. 582.3890; 21 C.F.R. 582.6033; *See also* 7 C.F.R. 205.605(b).

---

[8] http://www.naturesvariety.com/products

8.      Federal regulations [9] require that all fish meal or fish scrap ingredients be treated with some synthetic chemical preservative. Nature's Variety utilizes fish meal as an ingredient in several different pet food products. However, despite knowing that these products do, in fact, contain the synthetic chemical preservative ethoxyquin, Nature's Variety makes false and deceptive claims that its pet foods are either "natural," or are "100% free…of chemical preservatives."

9.      According to the Food and Drug Administration's Animal & Veterinary webpage, ethoxyquin is a known synthetic preservative that has been linked to several adverse health effects, such as the accumulation of hemoglobin pigment in the liver, as well as increases in the levels of liver-related enzymes in the blood, among other things. [10]

10.      In addition to the chemical preservatives that must be present in fish meal ingredients, Defendant also utilizes tocopherols and citric acid as preservatives in nearly all of its pet food products. It is abundantly clear that tocopherols, and citric acid are in fact synthetic chemical preservatives. Yet, Defendant makes false and deceptive claims that its pet foods are either "natural" or have no "chemical preservatives."

11.      Federal Regulations are significantly clear that ethoxyquin, tocopherols, and citric acid are synthetic chemical preservatives. *See* 21 C.F.R. 573.380 (ethoxyquin); 21 C.F.R. 582.3890 (tocopherols); 21 C.F.R. 582.6033 (citric acid). The FDA also recognizes tocopherols, as synthetic chemical preservatives. See Title 21, Part 182, Subpart D - Chemical Preservatives § 182.3890 Tocopherols.

---

[9] 46 C.F.R. § 148.265 Fish meal or fish scrap provides in part the following:
(c) At the time of production, fish meal or fish scrap must be treated with an effective antioxidant (at least 400 mg/kg (ppm) ethoxyquin, at least 1000 mg/kg (ppm) butylated hydroxytoluene, or at least 1000 mg/kg (ppm) of tocopherol-based liquid antioxidant).
[10] http://www.fda.gov/AnimalVeterinary/ResourcesforYou/ucm047113.htm

12.     Additionally, the 2015 AAFCO Official Publication Revision 1 also recognizes ethoxyquin, tocopherols, and citric acid as synthetic chemical preservatives. AAFCO requires that when any chemical preservative is used, a statement of the fact that a preservative has been added must be shown. *See* Chapter 6 Section 18.1 Chemical Preservatives, 2015 AFFCO Official Publication Revision 1.

13.     Nature's Variety products do, in fact, contain the chemical preservative ethoxyquin, as evidenced by laboratory analysis confirming same.  *See* Exhibit 2.

14.     Defendant has and continues to unfairly deceive its consumers by stating that the Nature's Variety Products are "natural," "naturally preserved," and are "100% free of chemical preservatives," when in fact the pet foods contain ethoxyquin, tocopherols, and citric acid. Additionally, Defendant's "natural" claims are false and deceptive as Nature's Variety pet foods contain sodium phosphate, and calcium phosphate.  Defendant furthers its deceptive acts by including genetically modified hexane processed ingredients such as lecithin, sunflower oil and canola oil in its pet foods marketed as being "natural". Therefore, several of Defendant's products are in violation of AAFCO Regulations, making these products misbranded and not actually "natural," nor "100% free of…chemical preservatives."

15.     As a consequence of Defendant's unfair and deceptive practices, Plaintiffs and members of the Class purchased the Nature's Variety Products under the false impression that the pet foods were in fact "natural," or completely void of synthetic, artificial, or chemically processed ingredients and chemical preservatives, and that Defendant complied with FDA and AAFCO Regulations for pet foods. Through its deceptive practices, Defendant sold its deceptively labeled "natural" products to thousands of consumers and received a substantial financial profit.

16.     Significantly, **each** consumer has been exposed to the **same** material misrepresentations and/or omissions, which are prominently displayed on the product packaging of Nature's Variety Products, and on Defendant's website, prior to purchasing the products.

17.     Under Federal law, products such as Defendant's Nature's Variety Products are "misbranded" if its "labeling is false or misleading in any particular," *See* 21 U.S.C. § 343(a) and AAFCO Guideline for Natural Claims.

18.     Further, any violation of 21 U.S.C. § 343(a) also constitutes violations of Florida Consumer Protection Statutes §§501.201- 501.213, Florida Deceptive and Unfair Trade Practices Act, Negligent Misrepresentation, the Florida Misleading Advertising Statute §817.41, Breach of Express Warranties pursuant to Florida Statute §672.313 and UCC §2-313 and Breach of Implied Warranties pursuant to Florida Statue §672.314, §672.315, and UCC §2-314 and §2-315, Unjust Enrichment, In this action, Plaintiffs assert claims under these state statutes, as well as under common law.

19.     For the reasons stated herein, Defendant's Nature's Variety Products sold in the United States are misbranded and illegal.

20.     Plaintiffs now seek to stop Defendant's unlawful conduct.

**PARTIES**

21.     Plaintiffs, Thomas Woods and Joshua Hinderer, purchased Defendant's Nature's Variety Products in this State and this District within the four years preceding the filing of this action (the "Class Period").

22.     During the time period between October 2014 and June 2015, Plaintiff Woods purchased 25.3 pound bags of Nature's Variety Instinct Grain Free Salmon Meal Formula Dry Dog Food, sold by Defendant, at a price of $71.99 per bag at PAWS pet supply. Plaintiff also

purchased 13.2 Oz cans of Nature's Variety Homestyle by Prairie Chicken Stew with Brown Rice, Sweet Potatoes, and Spinach Canned Dog Food, at a price of $35.88 for a case of 12 cans, at a Petco pet store in this State and this District within the four years preceding the filing of this action.

23.      During the time period between July 2014 and June 2015, Plaintiff Hinderer purchased 25.3 pound bags of Nature's Variety Instinct Grain-Free Beef & Lamb Meal Formula Dry Dog Food, sold by Defendant at a price of $79.99 per bag at Petco pet store.  Plaintiff Hinderer also purchased 5.5 Oz and 13.2 Oz cans of Nature's Variety Instinct Grain Free Beef Formula Canned Dog Food sold by Defendant, at a price of $2.29 and $3.99 respectively per can from a Petco pet store in this State and this District within the four years preceding the filing of this action.

24.      Plaintiffs are, and throughout the entire class period asserted herein have been, very concerned about, and attempted to avoid, purchasing foods for their pets that are not natural—such as foods that contain synthetic, artificial, and chemically processed ingredients. For this reason, Plaintiffs were willing to pay a premium price for pet foods that were "natural." Based on the "natural" representations on Defendant's Nature's Variety Products' labels, Plaintiffs and members of the Class reasonably believed the products they purchased were "Natural" and relied on these representations in making the purchases thereof.

25.      Not only did Plaintiffs purchase the Nature's Variety Products because the labels said they were "natural," Plaintiffs also paid more money for the products than they would have paid for other similar products that contained the same synthetic, artificial, and chemically processed ingredients.  Plaintiffs saw and relied on the product labels and product claims in deciding to purchase Defendant's pet food products.

26.     Had Plaintiffs known the truth—that the Nature's Variety Products were not "natural," were not "100% free of chemical preservatives," and that they violated FDA and AAFCO regulations — Plaintiffs would not have purchased Defendant's products, and would not have paid or been willing to pay the premium price for these products. Due to Defendant's misrepresentations on its product labels, Plaintiffs paid more than he or she would have paid otherwise, and/or entered the transactions described herein that would have been otherwise unnecessary. Defendant's misrepresentations concerning its pet food products were the immediate causes of the injury producing conduct, as Plaintiffs actually relied upon Defendant's deceptive and misleading statements when purchasing Defendant's products.

27.     Defendant, Nature's Variety, Inc., is a corporation incorporated in the State of Missouri, with its principal place of business located at 55 West Port Plaza Drive, Saint Louis, Missouri 63146.

28.     Defendant is a corporation that produces, advertises, markets, sells and distributes the Nature's Variety Products throughout the United States, including in this State, District, and Division.

## JURISDICTION AND VENUE

29.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which: (1) the matter in controversy exceeds the sum or value of $5,000,000.00 inclusive of interest and costs; (2) members of the class of Plaintiffs are citizens of a State different from the Defendant; and (3) the number of members of all proposed Plaintiff classes in the aggregate is greater than 100.

30.     This Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoings alleged herein occurred in Florida. Defendant also have sufficient minimum

contacts with Florida, and has otherwise intentionally availed itself to the markets in Florida through the promotion, marketing, and sale of products sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 139(b)(2) and (3) because a substantial part of the events or omissions giving rise to these claims occurred in this District, a substantial part of the events or omissions giving rise to the claim occurred within this District, Defendant caused harm to Plaintiffs in this District,  and Defendant is subject to the Court's personal jurisdiction with respect to this action.

## FACTS RELEVANT TO ALL CLAIMS

32.     To some consumers, including Plaintiffs, a product's manufacturing process and the ingredients' places of origin matter. Consumer purchasing decisions are heavily influenced by information about production processes and places of origin, such as whether food is kosher or halal, whether wine is from a particular locale, whether a diamond is conflict-free, or whether food was produced by union workers, although these considerations have nothing to do with the product's function or performance.  Plaintiffs' purchasing decisions in this case are directly influenced by Defendant's claimed manufacturing process and origin of ingredients. When representations about processes and origins are not true, the consumer who cares about them has not received the benefit of his or her bargain.  Specifically, Plaintiffs' purchasing decision was based directly on Defendant's claims that its pet food is "natural" and "100% free of chemical preservatives," which meant to Plaintiffs that the pet food they purchased did not contain any artificial, synthetic, and chemically processed ingredient or chemical preservative. Natural foods are reasonably believed to not contain genetically modified hexane processed ingredients, and foods marketed as 100% free of chemical preservatives are reasonably believed

10

to not contain any chemical preservatives.  Plaintiffs did not receive the benefit of his or her bargain as the representations about the pet food ingredient's processes and origins were not true.

33.     For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately. The economic harm—the loss of real dollars from a consumer's pocket—is the same whether or not a court might objectively view the products as functionally equivalent.  Plaintiffs relied on the truth and accuracy of Defendant's pet food labels and website claims and were deceived into making the purchases described herein.  Plaintiffs suffered economic harm as they paid more for Defendant's product than he or she otherwise might have been willing to pay if the product had been labeled accurately.

34.     While the FDA has not explicitly defined the term "natural," it has defined the outer boundaries of the use of the term natural by stating that a product is not natural if it contains synthetic or artificial ingredients. According to federal regulations promulgated by the United States Department of Agriculture ("USDA"), an ingredient is synthetic if it is a "substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources." (quoting 7 C.F.R. § 205.2). "Similarly, the USDA's Food Safety and Inspection Service ('FSIS') defines a natural product as a product that does not contain any artificial or synthetic ingredients and does not contain any ingredient that is more than minimally processed." See FDA Compliance Policy Guide Sec. 587.100, 21 C.F.R. 101.4(b)(5).

35.     In July 2013, several federal judges stayed class actions against food manufacturers and asked the FDA to weigh in on whether and under what circumstances food

products containing ingredients produced using bioengineered ingredients may be labeled "Natural," "All Natural," or "100% Natural." The FDA's policy considers "Natural" to mean "that nothing artificial or synthetic (including color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food."[11]

36.     Furthermore, AAFCO's 2015 Official Publication's Guidelines for "Natural" Claims provides in part:

> AAFCO recommends and supports the following guidelines for use of the term "natural" in the labeling of commercial feeds, pet foods, and specialty pet foods.
>
> (1)     In the AAFCO-defined feed term "natural," the use of the term "natural" is only acceptable in reference to the product as a whole when all of the ingredients and components of ingredients meet the definition.
>
> (2)     In the definition, the use of the term "natural" is false and misleading if any chemically synthesized ingredients are present in the product.

37.     AFFCO's 2015 Official Publication Revision 1 defines the term "natural" as, " a feed or ingredient derived solely from plant, animal or mined sources…not having been produced by or subject to a chemically synthetic process and not containing any additives or processing aids that are chemically synthetic except in amounts as might occur unavoidably in good manufacturing practices." Furthermore, the Publications states, "AAFCO has developed a feed term definition for what types of ingredients can be considered 'natural' and 'Guidelines for Natural Claims' for pet foods." According to AAFCO guidelines, "the term 'natural' can be construed as equivalent to a lack of artificial flavors, artificial colors, or artificial preservatives in

---

[11] *See* 58 Fed. Reg. 2302, 2407 (1993); *See also Cox v. Gruma Corp.,* No. 4:12-cv-6502-YGR (N.D. Cal.); *Barnes v. Campbell Soup Co.,* No. 3:12-cv-05185-JSW (N.D. Cal.); *In Re General Mills, Inc. Kix Cereal Litigation*, No. 2:12-cv-00249-KM-MCA (D.N.J.).

the product." AAFCO guidelines specifically state **"the use of the term "natural" is false and misleading if any chemically synthesized ingredients are present in the product."**

38.     Pursuant to 7 C.F.R. § 205.2, an ingredient is synthetic and/or artificial if it is:

*Synthetic*. A substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes.

*Nonsynthetic (natural)*. A substance that is derived from mineral, plant, or animal matter and does not undergo a synthetic process as defined in section 6502(21) of the Act (7 U.S.C. 6502(21)). For the purposes of this part, nonsynthetic is used as a synonym for natural as the term is used in the Act.

39.     Similarly, the USDA's Food Safety and Inspection Service ("FSIS") defined a natural product as, a product that "does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and (2) the product and its ingredients are not more than minimally processed."

Minimal processing may include: (a) those traditional processes used to make food edible or to preserve it or to make it safe for human [or animal] consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing….*See* USDA FSIS, Food Standards and Labeling Policy Book, available at www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf.

40.     In addition, in an FDA letter to Judges Yvonne Gonzalez Rogers, Jeffrey S. White, and Kevin McNulty, regarding the judges' request for the agency to make a determination about whether and under what circumstances food products containing ingredients produced using certain synthetic and/or artificial ingredients may be labeled "natural," the FDA writes:

FDA has not promulgated a formal definition of the term "natural" with respect to foods. The agency has, however, stated that its policy regarding the use of the term "natural" on food labeling means that "nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to bin tin the food." *See 58 Fed. Reg. 2302, 2407* (1993).

41.　　A reasonable consumer's understanding of the term "natural" comports with these federal definitions. A reasonable consumer would also expect that Defendant's products are what Defendant identify them to be on its labels (i.e. that they are "natural" and thus void of chemically synthetic and/or artificial ingredients).

42.　　Plaintiffs do not claim that Defendant's use of synthetic, artificial ingredients or chemical preservatives are not generally recognized as safe ("GRAS"). Plaintiffs' claims are premised on the fact that products labeled as being "natural" reasonably appear to not contain artificial, synthetic, or chemically processed ingredients. *See Garcia v. Kashi Co*., 12-21678-CIV, 2014 WL 4392163 (S.D. Fla. Sept. 5, 2014) ("All Natural" Kashi products reasonably appear not to contain GMOs, Pyridoxine Hydrochloride, Alpha–Tocopherol Acetate, Hexane–Processed Soy ingredients and Calcium Pantothenate"); *Jou v. Kimberly-Clark Corp*., C-13-03075 JSC, 2013 WL 6491158 (N.D. Cal. Dec. 10, 2013) ("Whether one labels a product "natural" or "all natural," the same plausible inference can be drawn—that the product is natural, meaning it is not made with any non-natural ingredients."). Courts have generally treated "100% natural" the same as "all natural." *See Bohac v. Gen. Mills, Inc*., 12-CV-05280-WHO, 2014 WL 1266848 (N.D. Cal. Mar. 26, 2014) ("100% Natural" granola bars reasonably appear not to contain soy lecithin, corn syrup, or natural flavor).

43.　　Additionally, AAFCO guidelines for "natural" claims require that the term "natural" is only acceptable in reference to the product as a whole when all of the ingredients and components of ingredients meet the definition. Defendant's products violate AAFCO guidelines

in that the use of the term "natural" is not acceptable due to the presence of synthetic ingredients and/or components of ingredients.

***The Products' Synthetic and/or Artificial Ingredients***

44.      **Ethoxyquin.** Some preservatives are added to ingredients or raw materials by the suppliers, and others may be added by the manufacturer. Pet foods are preserved with either synthetic or "natural" preservatives. Ethoxyquin is a synthetic preservative that is used in pet food. Ethoxyquin has also been used as a rubber preservative and/or pesticide and is listed and identified as a hazardous chemical under the criteria of the OSHA Hazard Communication Standard (29 CFR §§ 1910, 1220). The Chemical Toxicology of Commercial Products states that ethoxyquin has a toxic rating of 3 (on a scale of 1 to 6, with 6 being super toxic requiring less than 7 drops to produce death). Therefore, despite the "natural" and "100% free of…chemical preservatives," claims in reference to Defendant's products, its products contain Ethoxyquin – a known synthetic preservative that has been linked to several adverse health effects, such as the accumulation of hemoglobin pigment in the liver, among other things. According to the Federal Food and Drug Administration's Animal & Veterinary General Pet Food Labels guide, "CVM began receiving reports from pet owners attributing the presence of ethoqyquin in the pet food with a myriad of adverse effects, such as allergic reactions, skin problems, major organ failure, behavior problems, and cancer."

45.      **Tocopherols are not "natural" preservatives.** Tocopherols are a family of Vitamin E compounds which, typically, are found in leafy green vegetables, vegetable oils, fish and nuts. Tocopherols are commercially manufactured and mass produced in an attempt to utilize them as preservatives that extend the shelf life of products. Since there is usually a long span of time between the product's production and the time of purchase, commercial foodstuffs are

typically loaded with preservatives, such as tocopherols, to allow them to remain as fresh as possible for as long as possible. Although said preservatives are fairly effective in extending the longevity of the products, they are still extremely unhealthy. Many cause and/or promote skin problems while others have been reported to cause cancer. Tocopherols are used specifically as a chemical preservative throughout Defendant's pet food products, all of which claim to be natural, contain only natural ingredients and/or be void of artificial or synthetic/chemical preservatives. AAFCO has issued publications directly on point stating as follows:

> Some examples of ingredients used to provide vitamin activity include such materials as Cholecalciferol (supplies vitamin D from animal sources), Ergocalciferol (supplies vitamin D from plant sources), Vitamin B12 supplement, Riboflavin supplement (a source of vitamin B2), Vitamin A supplement, Vitamin D3 supplement, alpha-Tocopherol acetate (supplies vitamin E), Thiamine mononitrate (source of vitamin B1) and pyridoxine hydrochloride (source of vitamin B6).

> Some ingredients which function as chemical preservatives: Ascorbic acid, Benzoic acid, Butylated hydroxyl anisol (BHA), Butylated hydroxyltoluene (BHT), Calcium ascorbate, **Citric acid**, **Ethoxyquin**, Potassium sorbate, Sodium bisulfate, **Mixed Tocopherols**. Some of these preservatives have limits to the amount that can be used or what types of products the preservative can be added to. The fact that a preservative has been added must be shown, such as "preserved with BHT" or "mixed tocopherols (preservative)."

Isolated tocopherols are sometimes called mixed tocopherols, and are a class of chemical compounds with some vitamin E properties that are often used as a chemical food preservative (21 C.F.R. § 182.3890). Tocopherols are also recognized to be synthetic by federal regulation. *See* 7 C.F.R. § 205.605(b). Tocopherols are often used as a preservative in foods to prevent oils from going rancid. Mixed tocopherols are a combination of the four tocopherols present in vitamin E: alpha tocopherol, beta tocopherol, gamma tocopherol and delta tocopherol. Mixed tocopherols are a synthetic petrochemically-derived form of dl-alpha tocopherol, which has known toxic effects. This chemically-produced type of tocopherol is the cheapest and the most

widely sold. Unlike other vitamins, and their synthetic counterparts, synthetic Vitamin E is not identical to natural Vitamin E. It contains equal amounts of eight similar compounds. Only one compound is identical to natural Vitamin E, and therefore in a form that the body is accustomed to processing. Hexane solvent extraction is the procedure to extract tocopherols and tocotrienols from tissue and oilseed samples. The extract may be used directly after being dissolved in the mobile phase and filtered, or after additional purification steps. Therefore, no argument can be made for the benefits of synthetic Vitamin E – such as those in question in this complaint – since, according to the same article, synthetically produced tocopherols are only half as effective as the same amount of the natural form, and the natural forms are proven ineffective.[12] Tocopherols are also recognized as synthetic, chemical preservatives per 21 C.F.R. 582.3890.

46. **Citric Acid.** Citric Acid is made synthetically by the fermentation of glucose. The process of making this citric acid utilizes genetically engineered (GE) sugar beets and maize. These GE crops are used to grow genetically modified Aspergillus niger, a mold. The citric acid is then extracted from the Aspergillus niger using chemical solvents. The solvent used in the process consists of a mixture of *n-octyl* alcohol, synthetic isoparaffinic petroleum hydrocarbons, and tridecyl amine. After the extraction process, tridecyl amine may be present as a residue in citric acid. Citric acid increases the acidity of a microbe's environment, which makes it harder for bacteria and mold to survive and reproduce. Its main purpose is to serve as a preservative. Citric acid is commonly added to foods as a synthetic preservative, flavorant, and acidity regulator. It is clear that the Defendant utilizes citric acid only as a synthetic chemical preservative. Citric acid is not listed in any other way, or for any other purpose in Defendant's products. The 2015 AAFCO Official Publication recognizes citric acid as

---

[12] http://ods.od.nih.gov/factsheets/VitaminE-HealthProfessional/

a chemical preservative. *See* Chapter 6 Section 18.1. Federal regulations also classify citric acid as a synthetic food additive, and a sequestrant that functions as a chemical preservative. *See* 21 CFR 582.1033; *See also* 21 CFR 582.6033.

47.     **Lecithin.** Food manufacturers utilize commercial lecithin, which is not naturally occurring and is a mixture of phospholipids in oil. In a petition to the USDA to remove lecithin from the National List of Synthetics Allowed in Organics, Dr. Bernard Szuhaj, an expert on lecithin, states, "commercial lecithin is made from crude soybean oil extracted from soybean flakes with **hexane**. The crude soybean oil is treated with water or stream to precipitate the lecithin as gums. These wet gums are centrifuged and dried. Soybean oil and fatty acids are added to standardize the products." Dr. Szuhaj then goes on to say that, "the hexane used in commercial soybean processing is a neurotoxicant. In powdered and granular lecithin, acetone is used to precipitate the phospholipids from the oil and the acetone is removed by filtration and evaporation. Oxidized acetone may result in the acetone recovery process producing toxic compounds such as mesityl oxide and isoperhone." In the same document found on the USDA website, a USDA/Tap Reviewer Comment Form states that, "chemically modified lecithins are synthetic substances and should not be allowed under this classifications [National List]." Furthermore, the USDA Reviewer Form states that, "there is certainly a chance that trace amounts of **hexane** can be found in lecithin. Optimally lecithin from cold pressed oils would be a preference in the organic industry. However, the quality of these lecithins has been very poor." About ingesting **hexane**, which can be found in lecithin, the document states that, "[hexane] may produce abdominal pain, nausea. Aspiration into lungs can produce severe lung damage and is a medical emergency."[13] Furthermore, lecithin must be modified in order to make it suitable for

_____

[13] http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5073281

18

the product to which it is added. Consequently, manufacturers typically hydrolyze lecithin enzymatically. According to the FDA, "Food grade lecithin is a complex mixture of substances derived from the **processing** of soybean, corn, or safflower oil."[14] Furthermore, lecithin may be modified by a process called fractionation during which lecithin is mixed with alcohol. Thus, lecithin is highly processed. According to an article on the side effects of lecithin use in pets and cats published in a veterinary website, some side effects of lecithin use may include, "vomiting, diarrhea, bloating, lack of appetite, gas, [and] skin rashes."[15]

48. **Sodium Phosphate.** Sodium phosphates are synthetic chemical combinations of sodium salts and phosphates. Sodium phosphate is also classified as a sequestrant, which functions as a synthetic preservative, helping extend the shelf life of food products. *See* 21 C.F.R. 182.6778. Federal regulations classify sodium phosphates as synthetic ingredients. *See* 7 C.F.R. § 205.605(b). As a synthetic ingredient, sodium phosphate is improperly used in products that claim to be "natural" or contain only "natural ingredients". Sodium phosphate is not a mineral or vitamin.

49. **Calcium Phosphate.** Federal regulations classify calcium phosphates (monobasic, dibasic, and tribasic) as synthetic ingredients. *See* 7 C.F.R. § 205.605(b). Calcium phosphate is not a mineral, but is used as a synthetic stabilizer pursuant to 21 C.F.R. 181.29. As a synthetic ingredient, calcium phosphate is improperly used in products that claim to be "natural" or contain only "natural ingredients".

50. **GMOs.** A genetically modified ("GM") crop is a crop whose genetic material has been altered by humans using genetic engineering techniques. The World Health Organization defines genetically modified organisms ("GMOs"), which include genetically modified crops, as

---

[14] http://www.accessdata.fda.gov/scripts/fcn/fcnDetailNavigation.cfm?rpt=scogsListing&id=185
[15] http://www.vetinfo.com/lecithin-for-pets.html#b

"organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally." GM crops are not natural, but man-made.

51.     **Sunflower Oil.** Sunflower varieties are separated into two types: oil and confection (non-oil). Oil-type sunflowerseed is selected for specific characteristics such as oil yield, the amount of oleic acid in the oil, and the protein content of the meal (the residual left after extraction of the oil). Oil-type sunflower seeds are black with thin hulls. Oil-type seeds contain 35-55 percent oil (as compared with 18 percent for soybeans) and about 20 percent crude protein by weight, depending on the seed variety and irrigation use. The majority of oil-type sunflower seed is crushed in North Dakota and western Kansas to separate oil from meal. The amount of crush is primarily determined by demand for sunflower oil because the share of revenue from oil is larger than that from meal. Two major crushing technologies are used to process sunflowers in the United States. All crushing plants use a continuous feed expeller, which presses the oil from the seeds by mechanical pressure. This process retains 3-10 percent of the oil in the meal. Afterwards, crushing plants use a solvent extraction process where the remaining meal is washed with a *hexane* solution to dislodge nearly all the remaining oil. Solvent extraction reduces the oil content of sunflower meal to 0.5-1.0 percent, increasing the value of the meal and producing larger amounts of high-value sunflower oil.[16]

52.     **Canola Oil.** Canola oil was first created in the early 1970s as a natural oil, but in 1995 a genetically modified version of canola oil was created. As of 2005, 87 percent of canola grown in the U.S. was genetically modified, and by 2009, 90 percent of the crop was genetically engineered.[17] Canola oil is actually made from the rapeseed. The side effects of GMOs in general

---

[16] http://www.ers.usda.gov/topics/crops/soybeans-oil-crops/sunflowerseed.aspx
[17] Beckie, Hugh et al., *GM Canola: The Canadian Experience* Farm Policy Journal, Volume 8 Number 8, Autumn Quarter 2011.

cannot be overstated. In a 2011 review published in Environmental Sciences Europe, 19 studies of mammals fed GMO soybeans and corn were evaluated. The 90-day long trials indicated liver and kidney problems as a result of GMO foods. Kidneys were disrupted by 43.5 percent and liver by 30.8 percent.[18]

53.     **Hexane.** Hexane is a colorless, liquid chemical commonly extracted from petroleum and crude oil that gives off a subtle, gasoline-like odor. Hexane is a constituent of gasoline obtained from crude oil, natural gas liquids, or petroleum refinery processing. As recognized by the United States Occupational Safety and Health Administration ("OSHA"), hexane is a neurotoxin, which can cause irritation to the eyes and upper respiratory tract. Commercial hexane also contains benzene, a known hematologic poison linked to chronic leukemia. Hexane is used for purposes that include extracting edible oils from seeds and vegetables (such as lecithin, sunflower oil, canola oil). It is classified as an air pollutant by the Environmental Protection Agency and as a neurotoxin by the Centers for Disease Control and Prevention. Hexane is also used as an additive in consumer products including gasoline, glue, varnishes and inks, as a cleaning agent in textile, furniture and printing industries, as a special glue used in roofing, shoemaking and leather products, and extracting oil and grease contaminates from soil and water for analysis in laboratories.

54.     Despite Defendant's numerous affirmative claims that its pet foods are "natural" and "100% free of chemical preservatives," Defendant specifically uses synthetic, artificial, chemical preservatives such as ethoxyquin, tocopherols, citric acid, and synthetic, artificial, chemically processed ingredients such as sodium phosphate, and calcium phosphate, genetically

---

[18] Seralini GE, Clair E, Mesnage R, Gress S, Defarge N, Malatesta M, Hennequin D, Vendomois JS. *Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize*. Food and Chemical Toxicology.

modified ingredients, and hexane processed ingredients such as lecithin, sunflower oil and canola oil– all recognized as synthetic per 21 C.F. R. 573.3280; 21 C.F.R. 582.3890; 21 C.F.R. 582.6033; *See also* 7 C.F.R. 205.605(b).

55.     While Defendant labels its Nature's Variety Products at issue in this matter as "natural" and "100% free of chemical preservatives," the ethoxyquin, tocopherols, citric acid, sodium phosphate, calcium phosphate, lecithin, sunflower oil, and canola oil ingredients in Defendant's products, are chemically synthetic and/or artificial compounds and/or genetically modified organisms.

56.     AAFCO does not permit Defendant to falsely and deceptively label and market its pet food products as "natural," when that term clearly does not apply to the product as a whole.

57.     AAFCO guidelines for "natural" claims require that the term "natural" is only acceptable in reference to the product as a whole when all of the ingredients and components of ingredients meet the definition.  These Nature's Variety Products violate AAFCO guidelines in that the use of the term "natural" is not acceptable due to the presence of synthetic ingredients and/or components of ingredients.

58.     Defendant has used the term "natural" to shape its brand and sell its pet foods. Yet, the existence of chemical, synthetic, and artificial ingredients in its pet food renders the use of the label "natural" false and misleading. In manufacturing it products, Defendant had a choice between using natural or chemically synthetic and/or artificial ingredients. They purposefully chose to use chemically synthetic and artificial ingredients, but nonetheless labeled its food products as "natural."

59.     With respect to the Nature's Variety Products, Defendant has violated the FDCA and regulations promulgated thereunder. Specifically 21 U.S.C. 321(f) provides "the term 'food' means (1) articles used for food or drink for man or other animals."

60.     Defendant has violated 21 U.S.C. 331(a). Specifically, 21 U.S.C. 331(a) provides that it is unlawful to introduce or deliver for introduction into interstate commerce any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

61.     Defendant has violated 21 U.S.C. 331(b). Specifically, 21 U.S.C. 331(b) provides that the act of adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce is prohibited.

62.     Defendant has violated 21 U.S.C. 331(c). Specifically, 21 U.S.C. prohibits the receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay.

63.     Defendant has violated 21 U.S.C. 331(g). Specifically, 21 U.S.C. 331(g) provides that it is unlawful to manufacture within any territory any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

64.     It is plausible that a reasonable consumer, such as Plaintiffs and members of the Class, could interpret the words "natural" to exclude synthetic, artificial, chemical preservatives such as ethoxyquin, tocopherols, citric acid, and synthetic, artificial, chemical ingredients such as sodium phosphate, and calcium phosphate, genetically modified and hexane processed ingredients such as lecithin, sunflower oil and canola oil, and therefore be misled by Defendant's labeling.[19]

---

[19] *See, e.g., Vicuna v. Alexia Foods, Inc*., No. 11-6119 (PJH), 2012 WL 1497507, at *2 (N.D. Cal. Apr. 27, 2012) (holding that "whether a reasonable consumer" of a product that  contains SAPP "would likely be deceived by the designation 'All Natural' is a factual dispute" that cannot be resolved at the motion to dismiss stage); *see also Janney v. Mills*, No. 12-cv-03919 (WHO), 2014 WL 1266299, at *3 (N.D. Cal. Mar. 26, 3014) (collecting cases in

65.     Plaintiffs relied on Defendant's false and deceptive claims described herein, and based and justified the decision to purchase the Nature's Variety Products in substantial part, on these claims.

66.     At point of sale, Plaintiffs did not know, and had no reason to know, that the Nature's Variety Products contained synthetic, artificial, chemical preservatives such as ethoxyquin, tocopherols, citric acid, and synthetic, artificial, chemical ingredients such as sodium phosphate, and calcium phosphate, genetically modified and hexane processed ingredients such as lecithin, sunflower oil and canola oil and that the products violate FDA and AAFCO Regulations for Pet Foods.

67.     At point of sale, Plaintiffs did not know, and had no reason to know, that the Nature's Variety Products were unlawful and misbranded. Had Plaintiffs been aware of these material facts, they would not have bought the Nature's Variety Products.

68.     As a result of Defendant's unlawful misrepresentations, Plaintiffs and millions of others in Florida and throughout the United States purchased the Nature's Variety Products. Defendant's labeling as alleged herein is false and misleading and was designed to increase sales of the Nature's Variety Products. Defendant's misrepresentations are part of its systematic labeling practice. A reasonable person would attach importance to Defendant's misrepresentations in determining whether to purchase the Nature's Variety Products. Plaintiffs' purchase of the Nature's Variety Products damaged them. Such purchases damaged Plaintiffs

---

which "[c]ourts have found similar claims challenging the terms 'all natural' and 'natural' to be sufficient basis for a cause of action under California's consumer protection laws"); *Morales v. Unilever U.S., Inc*., No. 13-cv-2213 (WBS), 2014 WL 1389613, at *7 (E.D. Cal. Apr. 9, 2014) (explaining that "the relevant question" in a deceptive labeling case "is the meaning that consumers would attach to the term" at issue and that "this is generally not a question that can be resolved on a motion to dismiss"); *Von Koenig v. Snapple Beverage Corp.*, 713 F. Supp 2d 1066, 1080 (E.D. Cal. 2010) ("[P]laintiffs allege that they were deceived by the labeling of defendant's drink products as 'All Natural' because they did not believe that the product would contain [high fructose corn syrup]…[P]laintiffs have stated a plausible claim that a reasonable consumer would be deceived by defendant's labeling.")

because, *inter alia*, misbranded products are illegal and have no economic value. Such purchases damaged Plaintiffs because, *inter alia,* Plaintiffs had cheaper alternatives available and paid an unwarranted premium for the Nature's Variety Products. All purchasers of the Nature's Variety Products were injured.

## CLASS ACTION ALLEGATIONS

69.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in Florida who, within the Class Period, purchased, "Nature's Variety Instinct Grain-Free Salmon Meal Formula Dry Dog Food," "Nature's Variety Instinct Grain-Free Beef & Lamb Meal Formula Dry Dog Food," "Nature's Variety Homestyle by Prairie Chicken Stew with Brown Rice, Sweet Potatoes, and Spinach Canned Dog Food," and/or "Nature's Variety Grain-Free Beef Formula Canned Dog Food."

> Alternatively, All persons in the United States who, within the Class Period, purchased, "Nature's Variety Instinct Grain-Free Salmon Meal Formula Dry Dog Food," "Nature's Variety Instinct Grain-Free Beef & Lamb Meal Formula Dry Dog Food," "Nature's Variety Homestyle by Prairie Chicken Stew with Brown Rice, Sweet Potatoes, and Spinach Canned Dog Food," and/or "Nature's Variety Grain-Free Beef Formula Canned Dog Food."

70.     The following persons are expressly excluded from the Class: (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

71.     This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

72.     **Numerosity:** Based upon Defendant's publicly available sales data with respect to the Nature's Variety Products, it is estimated that the Class numbers are potentially in the millions, and the joinder of all Class members is impracticable.

73.  **Common Questions Predominate:** This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members. Thus, proof of a common set of facts will establish the right of each Class member to recover. Questions of law and fact common to each Class member include, for example:

a.  Whether Defendant engaged in unfair, unlawful or deceptive business practices by failing to properly package and label the Nature's Variety Products sold to consumers;

b.  Whether the pet food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

c.  Whether Defendant made unlawful and misleading claims regarding the "Natural" characteristic of the Nature's Variety Products;

d.  Whether Defendant violated Florida Consumer Protection Statutes §§501.201-501.213, Florida Deceptive and Unfair Trade Practices Act, Negligent Misrepresentation, the Florida Misleading Advertising Statute §817.41, Breach of Express Warranties pursuant to Florida Statute §672.313 and UCC §2-313 and Breach of Implied Warranties pursuant to Florida Statue §672.314, §672.315, and UCC §2-314 and §2-315, Unjust Enrichment.

e.  Whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief;

f.  Whether Defendant's unlawful, unfair and/or deceptive practices harmed Plaintiffs and the Class;

g.  Whether Defendant acted negligently by its deceptive practices;

h.  Whether Defendant was unjustly enriched by its deceptive practices.

74.    **Typicality:** Plaintiffs' claims are typical of the claims of the Class because Plaintiffs purchased Defendant's products during the Class Period. Defendant's unlawful, unfair, and fraudulent actions concern the same business practices described herein, irrespective of where they occurred or were experienced. The injuries of each member of the Class were caused directly by Defendant's wrongful conduct. In addition, the factual underpinning of Defendant's misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

75.    **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor their counsel have any interests that conflict with or are antagonistic to the interests of the Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the members of the Class. Plaintiffs and their counsel have the necessary resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharged those duties by vigorously seeking the maximum possible recovery for the Class.

76.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they are not parties. Class Action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

and without the unnecessary duplication of effort and expense that numerous individual actions would create. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

77.     The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive or equitable relief with respect to the Class as a whole.

78.     The prerequisites to maintaining a class action pursuant to Fed R. Civ. P. 23(b)(3) are met as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

79.     Plaintiffs and their counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

80.     Plaintiffs are members of the Class they seek to represent.  Plaintiffs' claims are typical of the Class members' claims. Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiff's claims are typical and representative of the Class.

81.     There are no unique defenses that may be asserted against Plaintiffs individually, as distinguished from the Class. The claims of Plaintiffs are the same as those of the Class.

82.     This class action is superior to any other method for the fair and efficient adjudication of this dispute.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF FLORIDA CONSUMER PROTECTION STATUTES §501.201- §501.213, FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

83.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

84.     Defendant's conduct constitutes unlawful, unfair and deceptive business acts and trade practices.

85.     Defendant sold the Nature's Variety Products in Florida during the Class Period, and Plaintiffs purchased Nature's Variety products during the class period.

86.     Florida Consumer Protection Statue §501.204 (2012) prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising. For the reasons discussed above, Defendant has engaged in unfair, false, deceptive, untrue and misleading advertising in violation of Fla. Stat. §§501.201-501.213 (2014).

87.     The Florida Deceptive and Unfair Trade Practices Act also prohibits any, "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in conduct of any trade or commerce." Defendant has violated Fla. Sat. §501.204's prohibition against engaging in unlawful acts and practices by, *inter alia,* making the false and deceptive representations, and also through its omissions of material facts, as set forth more fully

herein, and violating 21 U.S.C. §342, 21 U.S.C. §343, 21 U.S.C. §379aa-1, 15 U.S.C. §45 (a)(I),

49 Fed. Reg. 30999 (Aug. 2, 1984), Federal Food, Drug and Cosmetic Act §402(f)(1)(A), and the

common law.

88. Plaintiffs and the Class reserve the right to allege other violations of law which

constitute other unlawful business acts or practices. Such conduct is ongoing to this date.

89. Defendant's acts, omissions, misrepresentations, practices and non-disclosures as

alleged herein also constitute "unfair" business acts and practices within the meaning of The

Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§501.201-501.213 (2014), in that

its conduct is substantially injurious to consumers, offends public policy, and is immoral,

unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged

benefits attributed to such conduct.

90. As stated in this Complaint, Plaintiffs allege violations of consumer protection,

unfair competition, and truth-in-advertising laws in Florida resulting in harm to consumers.

Defendant's conduct constitutes violations of the public policies against engaging in false and

misleading advertising, unfair competition and deceptive conduct towards consumers as

proscribed by Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§501.201-501.213

(2014).

91. There were reasonably available alternatives to further Defendant's legitimate

business interests, other than the conduct described herein.

92. Defendant's claims, nondisclosures and misleading statements, as more fully set

forth above and collectively as a scheme, are false, misleading and likely to deceive the

consuming public within the meaning of Florida Deceptive and Unfair Trade Practices Act.

93.     Defendant's deceptive conduct constitutes a prohibited practice, which directly

and proximately caused and continues to cause substantial injury to Plaintiffs and the other Class

members. Plaintiffs and Class members have suffered injury in fact, actual damages, and have

lost money as a result of Defendant's unlawful, unfair and fraudulent conduct.  Plaintiffs'

damages are the difference in the market value of the product or service in the condition in which

it was delivered and its market value in the condition in which it should have been delivered

according to the contract of the parties.  Defendant's deceptively labeled, and falsely advertised,

and misbranded products have little to no market value.

94.     Unless restrained and enjoined, Defendant will continue to engage in the above-

described conduct. Accordingly, injunctive relief is appropriate. When Defendant made the

representations set forth above, it had no reasonable grounds for believing them to be true.

95.     Defendant made the representations with the intention of inducing Plaintiffs and

Class Members to act in reliance upon these representations in the manner alleged herein, or with

the expectation that they would so act.

96.     In reliance on these representations, Plaintiffs and Class Members were induced

to and did pay monies to purchase Defendant's pet food products.

97.     Had Plaintiffs and Class Members known the actual facts, they would not have

taken such action.  Furthermore, Plaintiffs and other consumers had no reason to believe that

Defendant would act otherwise than as to rely on the "natural" representation.

98.     As a proximate result of the fraudulent and/or negligent conduct of Defendant as

herein alleged, Plaintiffs and Class members paid monies to Defendant, through Defendant's

regular retail sales channels, to which Defendant is not entitled, and have been damaged in an

amount to be proven at trial.  When representations about processes and origins of ingredients in

a product are not true, the consumer who cares about them has "not received the benefit of his or her bargain."

99.    Plaintiffs, on behalf of themselves, and all others similarly situated, seek restitution and disgorgement of all money obtained from Plaintiffs and the members of the Class collected as a result of unfair competitions, an injunction prohibiting Defendant from continuing such practices, corrective advertising, including providing notification of the product's health risks, and all other relief this Court deems appropriate, consistent with Florida Deceptive and Unfair Trade Practices Act.

## COUNT II

## NEGLIGENT MISREPRESENTATION

100.    Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

101.    During the relevant statutory time period, Defendant made false "Natural" representations to Plaintiffs and Class Members as they pertain to the sale of its pet foods.

102.    The representations of material fact that Defendant's pet food products were "Natural" was false.  The true facts are that the pet foods: 1.) contain known synthetic, artificial, chemical preservatives such as ethoxyquin, tocopherols, citric acid, and contain synthetic, artificial, chemically processed ingredients such as sodium phosphate, and calcium phosphate, genetically modified and hexane processed ingredients such as lecithin, sunflower oil and canola oil; 2.) despite having known recognized chemically synthetic ingredients, Defendant labeled its pet foods as being "natural."

103.    When Defendant made the false representations set forth above, it had no reasonable grounds for believing them to be true.  Defendant made the representations with the

intention of inducing Plaintiffs and Class Members to act in reliance upon these representations in the manner alleged herein, or with the expectation that they would so act.

104.    Plaintiffs and Class Members, at the time the false representations were made by Defendant, and at the time Defendant took the actions herein alleged, were ignorant of the falsity of the representations and believed them to be true. In reliance on these representations, Plaintiffs and Class Members were induced to and did pay monies to purchase Defendant's pet food products.

105.    Had Plaintiffs and Class Members known the actual facts, they would not have taken such action. Furthermore, Plaintiffs and other consumers had no reason to believe that Defendant would act otherwise than as to rely on the "natural" and "100% free of chemical preservatives" representations.

106.    Without knowledge, Plaintiffs and Class Members acted on the false "natural" and "100% free of chemical preservatives" representations and purchased Defendant's pet food products. Had Plaintiffs and Class Members known the actual facts, they would not have taken such action.

107.    As a proximate result of the fraudulent and/or negligent conduct of Defendant as herein alleged, Plaintiffs and Class members paid monies to Defendant, through Defendant's regular retail sales channels, to which Defendant is not entitled, and have been damaged in an amount to be proven at trial. When representations about processes and origins of ingredients in a product are not true, the consumer who cares about them has "not received the benefit of his or her bargain."

108.    As a direct and proximate result of Defendant's misrepresentations, Plaintiffs and Class members have sustained injuries by purchasing the Nature's Variety Products, which were

not as represented, thus entitling Plaintiffs to judgment and equitable relief against Defendant, as well as restitution, including all monies paid for the Nature's Variety Products and disgorgement of profits from Defendant received from sales of the products, attorneys' fees, and costs, as set forth in the Prayer for Relief.

**COUNT III**

**VIOLATION OF FLORIDA MISLEADING
ADVERTISING STATUTE §817.41**

109.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

110.     Florida Statute §817.41, prohibits "any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement. Such making or dissemination of misleading advertising shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pretenses."

111.     By creating and disseminating the false and deceptive advertising campaign described herein, Defendant has falsely represented to the public that its products are "natural" and "100% free of ... chemical preservatives," when in fact they contain synthetic and/or artificial chemical preservatives such as ethoxyquin, tocopherols, citric acid, synthetic and/or artificial chemical ingredients including but not limited to, sodiumphosphate, and calcium phosphate, genetically modified ingredients, and hexane processed ingredients such as lecithin, sunflower oil and canola oil.

112.     Defendant knew, or should have known, that the aforementioned false representations of material fact disseminated by the Defendant were false.

113.     Defendant disseminated false representations of material fact with the intent to induce Plaintiffs, and other members of the Class, to rely on said false misrepresentations.  The false representations of material fact made by the Defendant were likely to deceive reasonable consumers.

114.     The Plaintiffs, and other members of the Class, reasonably relied on the false representations of material fact made by the Defendant. In relying on the false representations of material facts made by the Defendant, the Plaintiff, and other members of the Class, were deceived.

115.     As a direct and proximate cause of Defendant's violation of Florida Statute §817.41, Plaintiffs and the members of the Class, were injured when they paid good money for the Defendant's illegal and worthless products.

116.     As a result of Defendant's unlawful false advertising practices, Plaintiffs and the members of the Class who purchased Defendant's products in Florida, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and to restore to Plaintiffs and the members of the Class any money paid for the Defendant's product.

117.     Plaintiffs and the members of the Class are also entitled to costs, including reasonable attorney's fees.  Under §817.41, Florida Statutes, Florida Plaintiffs and the members of the class are also entitled to be awarded punitive damages in addition to the actual damages proven.

## COUNT IV

## BREACH OF EXPRESS WARRANTY PURSUANT TO § 672.313 FLORIDA STATUTES AND UNIFORM COMMERICAL CODE §2-313

118.	Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

119.	Plaintiffs, and each member of the Class, formed a contract with Defendant at the time Plaintiffs and the other members of the Class purchased the Nature's Variety Products. The terms of that contract included express promises and affirmations of fact made by Defendant on the Nature's Variety Products' packaging and through its marketing campaign, as described above. The Nature's Variety Products packaging and advertising constitute express warranties and became part of the basis of the bargain, and is part of a standardized contract between Plaintiffs and the members of the Class on the one end, and Defendant on the other.

120.	The Uniform Commercial Code §2-313 provides that express warranties by the seller are created when any affirmation of fact or promise is made by the seller to the buyer which relates to the goods, and thus becomes part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation or promise.  In addition, any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

121.	Florida has codified and adopted the provisions the Uniform Commercial Code governing express warranties.  *See* Fla. Stat. §672.313 (2014).

122.	Nature's Variety Products are "goods" as defined in the various states' commercial codes governing express warranties, including Florida. At all times, and as detailed above, Defendant expressly warranted that its products were "natural" and "100% free of chemical preservatives."

123.    At the time of making these and other warranties with respect to the characteristics of Nature's Variety Products, Defendant knew or should have known that it had breached the terms of the contract, including the express warranties with Plaintiffs and the Class, by selling the Nature's Variety Products that contained synthetic, artificial, chemical preservatives such as ethoxyquin, tocopherols, citric acid, synthetic, artificial, chemical ingredients including but not limited to, sodium phosphate, and calcium phosphate, genetically modified hexane processed ingredients such as lecithin, sunflower oil and canola oil.

124.    Members of the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendant, and upon said express warranties, when purchasing the Nature's Variety Products.

125.    Plaintiffs and the Class purchased the Nature's Variety Products without knowledge that these products contained synthetic, artificial, chemical preservatives and ingredients, and genetically modified hexane processed ingredients.

126.    Due to Defendant's wrongful conduct as alleged herein, Plaintiffs and the Class could not have known about the true content of the Nature's Variety Products.

127.    As a direct and proximate result of Defendant's breach of its contract, including the breach of express warranties with respect to the Nature's Variety Products, Plaintiffs suffered injuries as set forth above, entitling Plaintiffs to judgment and equitable relief against Defendant, as well as restitution, including all monies paid for the Nature's Variety Products and disgorgement of profits Defendant received from sales of the Nature's Variety Products, attorneys' fees, and costs as set forth in the Prayer for Relief.

128.    All conditions precedent to Defendant's liability under this contract, including notice, have been performed by Plaintiffs and the Class.

129.     Florida holds that an express warranty can be conferred to the ultimate user of the product – either in written form or by direct assurances from the manufacturer/supplier – regardless of technical privity. Florida has long recognized that a person to whom an express warranty is conferred is entitled to enforce that warranty against that warrantor. *See Cedars of Lebanon Hospital Corp. v. European X-Ray Distrivutors of America, Inc.,* 444 So. 2d 1068 (Fla. 3d DCA 1984); *Cf. Moto Homes of America, Inc. v. O'Donnell*, 400 So. 2d 422 (Fla. 4th DCA 1983) (citing *Magnusson-Moss Warranty Act* at 15 U.S.C.A. 2310(f)).

130.     Plaintiffs, and each member of the Class, formed a contract with Defendant at the time Plaintiffs and the other members of the Class purchased Defendant's products. The terms of that contract include the express and implied promises and affirmations of fact made by Defendant's on its products' packaging and through its marketing campaign, as described above. Defendant's products' packaging and advertising constitutes express and implied warranties, became part of the basis of the bargain, and is part of a standardized contract between Plaintiffs and the members of the Class on the one end, and Defendant on the other.

131.     At all times, and as detailed above, Defendant expressly warranted that its products were "natural," and "100% free of chemical preservatives."

132.     At the time of making these and other warranties with respect to the characteristics of Defendant's products, Defendant knew or should have known that it had breached the terms of the contract, including the express warranties with Plaintiffs and the Class.

133.     At the time of making these and other warranties with respect to the quality of Defendant's products, Defendant knew or should have known that it had breached the terms of the contract, including the express warranties with Plaintiffs and the Class by warranting that: its products are "natural" and "100% free of…chemical preservatives," while knowing that its

products in fact contain synthetic and/or artificial chemical preservatives such as ethoxyquin, tocopherols, citric acid, and synthetic and/or artificial chemical ingredients such as sodium phosphate, and calcium phosphate, genetically modified ingredients, and hexane processed ingredients such as lecithin, sunflower oil and canola oil.

134.    Members of the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendant, and upon said express warranties in purchasing Defendant's product.

135.    Plaintiffs and the Class purchased Defendant's product without knowledge that the ingredients of the products were not "natural," and not "100% free of…chemical preservatives," and therefore different from the label.

136.    Members of the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendant, and upon said express warranties, when purchasing Defendant's products.

137.    Due to Defendant's wrongful conduct as alleged herein, Plaintiffs and the Class could not have known about the true content of the Defendant's products.

138.    As a direct and proximate result of Defendant's breach of its contract, including the breach of express warranties with respect to the Defendant's products, Plaintiffs suffered injuries as set forth above, entitling Plaintiffs to judgment and equitable relief against Defendant, as well as restitution, including all monies paid for the Defendant's products and disgorgement of profits Defendant received from sales of its products, attorneys' fees, and costs as set forth in the Prayer for Relief.

139.     Florida has long recognized that a person to whom an express warranty is conferred is entitled to enforce that warranty against that warrantor.[20]

140.     Additionally, in *Smith v. Wm. Wrigley Jr. Co.*, 663 F.Supp.2d 1336 (S.D. Fla. 2009), a case highly analogous to the case at bar, Judge Cohn concluded that the plaintiff's claim for breach of express warranty survived the defendant's motion to dismiss, despite the absence of privity. *Id.* at 1343. In reaching such a finding, the Court found it significant that the express warranty the manufacturer allegedly breached is contained on the packaging of Eclipse gun. Id. (Similarly, the express warranty Defendant breached in the matter before this Court, that its pet foods are "natural," and "100% free of…chemical preservatives," is contained on the packaging and website of Defendant's pet food products.)

141.     All conditions precedent to Defendant's liability under this contract, including notice, have been performed by Plaintiffs and the Class.

**COUNT V**

**BREACH OF IMPLIED WARRANTY: MERCHANTABILITY; USAGE OF TRADE PRUSUANT TO § 672.314 FLORIDA STATUTES AND UNIFORM COMMERICAL CODE §2-314**

142.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

143.     The Uniform Commercial Code §2-314 provides that, unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of the kind.

---

[20] *See Cedars of Lebanon Hospital Corp. v. European X-Ray Distrivutors of America, Inc.*, 444 So. 2d 1068 (Fla. 3d DCA 1984); *Cf. Moto Homes of America, Inc. v. O'Donnell*, 400 So. 2d 422 (Fla. 4th DCA 1983) (citing Magnusson-Moss Warranty Act at 15 U.S.C.A. 2310(f)).

144.    Florida has codified and adopted the provisions the Uniform Commercial Code governing the implied warranty of merchantability. Fla. Stat. §672.314 (2014).

145.    Defendant's products are "goods" as defined in the various states' commercial codes governing the implied warranty of merchantability, including Florida.

146.    As designer, manufacturer, licensor, producer, marketer, and seller of its products, Defendant is a "merchant" within the meaning of the various states' commercial codes governing the implied warranty of merchantability, including Florida.

147.    By placing its products in the stream of commerce, Defendant impliedly warranted that its products were "natural", and "100% free of…chemical preservatives," and that all claims on its packaging were true.

148.    As merchants of its products, Defendant knew that purchasers relied upon it to design, manufacture, license and sell products that were not deceptively marketed, and in fact members of the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendant and upon said implied warranties in purchasing and consuming Defendant's products.

149.    Plaintiffs and the Class members purchased the Defendant's products for their intended purpose.

150.    Defendant's products' defects were not open or obvious to consumers, including Plaintiffs and the Class, who could not have known about the true nature and contents of the Defendant's products.

151.    Plaintiffs, and each member of the Class, formed a contract with Defendant at the time Plaintiffs and the other members of the Class purchased Defendant's products. The terms of that contract included implied promises and affirmations of fact made by Defendant on the Defendant's products' packaging and through its marketing campaign, as described above.

152.     The Defendant's products' packaging and advertising constitute implied warranties, became parts of the basis of the bargain, and are parts of a standardized contract between Plaintiffs and the members of the Class on the one end, and Defendant on the other.

153.     At all times, and as detailed above, Defendant impliedly warranted that that its products were "natural", and "100% free of…chemical preservatives," for the companion pets of consumers, including Plaintiffs and the Class, that they were of merchantable quality, and that they did not produce dangerous side effects.

154.     At the time of making these and other warranties with respect to the quality of Defendant's products, Defendant knew or should have known that it had breached the terms of the contract, including the implied warranties with Plaintiffs and the Class.

155.     Members of the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendants, and upon said implied warranties, when purchasing Defendant's products.

156.     Due to Defendant's wrongful conduct as alleged herein, Plaintiffs and the Class could not have known about the true content of the Defendant's products.

157.     As a direct and proximate result of Defendant's breach of implied warranties and breach of merchantability, Plaintiffs and Class members have sustained injuries by purchasing the Defendants' products, which were not as represented, thus entitling Plaintiffs to judgment and equitable relief against Defendant, as well as restitution, including all monies paid for the Defendants' products and disgorgement of profits from Defendant received from sales of the products, attorneys' fees, and costs as set forth in the Prayer for Relief.

158.     All conditions precedent to Defendant's liability under this contract, including notice, has been performed by Plaintiffs and the Class.

## COUNT VI

## UNJUST ENRICHMENT

159.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

160.     As a result of Defendant's fraudulent and misleading labeling, advertising, marketing, and sales of the Nature's Variety Products, Defendant was enriched at the expense of Plaintiffs and the Class.

161.     Defendant sold the Nature's Variety Products, which were products that were illegally sold, illegally branded and had no economic value, to Plaintiffs and the Class.

162.     It would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits they received from Plaintiffs and the Class in light of the fact that the products were not what Defendant purported them to be.

163.     Thus, it would be unjust and inequitable for Defendant to retain the benefit without restitution to Plaintiffs and the Class of all monies paid to Defendant for the Nature's Variety Products at issue.  When representations about processes and origins of ingredients in a product are not true, the consumer who cares about them has "not received the benefit of his or her bargain."

164.     As a direct and proximate result of Defendant's actions, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury of their claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all other similarly situated persons, pray for judgment against Defendant as follows:

A.      For an order certifying this case as a Class Action and appointing Plaintiffs and their counsel to represent the Class;

B.      That the Court adjudges and decrees that Defendant has engaged in the conduct alleged herein;

C.      Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendant by means of any act or practice declared by this Court to be wrongful;

D.      Ordering Defendant to engage in a corrective advertising campaign;

E.      Awarding Plaintiffs and the proposed Class members damages;

F.      Awarding restitution and disgorgement to Plaintiffs and the other Class members;

G.      Awarding Plaintiffs and the Classes punitive damages;

H.      Awarding attorneys' fees and costs; and

I.      Providing such further relief as may be just and proper.

Dated: July 2, 2015

Respectfully submitted,


By: */s/ Tim Howard*
Tim Howard, J.D., Ph.D.
Florida Bar No.: 655325
**HOWARD & ASSOCIATES, P.A.**
2120 Killarney Way, Suite 125
Tallahassee, FL 32309

Telephone: (850) 298-4455
Fax: (850) 216-2537
tim@howardjustice.com